# EXHIBIT 1

**BEFORE THE FOREIGN SERVICE GRIEVANCE BOARD**

In the Matter Between

Likza Iglesias

Charged Employee

and

United States Agency for International
Development, Office of the Inspector General

_____

Record of Proceedings

FSGB No. 2012-057

January 6, 2017

**DECISION**

For the Foreign Service Grievance Board:

| | |
|---|---|
| Presiding Member: | Susan R. Winfield |
| Board Member: | Nancy M. Serpa |
| Special Assistant | Andrew D. Large |
| Representative for the Charged Employee: | Daniel S. Crowley<br>Hannon Law Group |
| Representative<br>for the Office of the Inspector General: | Lisa Goldfluss<br>Legal Counsel to the Inspector General |

## OVERVIEW

**Held**:  The agency proved, by preponderant evidence, four of five charges involving false reimbursement submissions by the charged employee.  The employee failed to prove a whistleblower retaliation defense, in that she was unable to prove by preponderant evidence that anyone involved in the decision to terminate her had actual or constructive knowledge of her protected disclosures.  The proposal for separation, while severe, is upheld.

**Summary**:  Grievant, Likza Iglesias, an FS-02 Auditor with the Office of the Inspector General at USAID, was charged with five specifications on each count of poor judgment and intentional false statements on official forms.  She was proposed for separation based on her conduct.

After resolving several questions regarding the authority of the then-Acting Inspector General to recommend separation of an employee, the Board held a hearing on the charges in July 2014 at which time the charged employee withdrew her whistleblower retaliation defense.  After the hearing, but before a final order issued, the employee filed a request to reinstate the defense based upon press stories alleging that the then-Acting Inspector General had removed or caused removal of certain negative findings from audit reports, none of which involved grievant.  The Board granted the employee's request to depose two additional witnesses whose testimony pertained only to the whistleblower defense, granted her request for limited additional discovery, denied her request to compel disclosure of the name of the confidential informant who had first reported the employee's false voucher submissions, and reopened the hearing to take testimony on the whistleblower retaliation defense.

The Board found that the agency proved four of the five merged charges of submitting false reimbursement vouchers by the employee, but failed to prove that her request for larger housing was knowingly false or otherwise a violation of the mission's housing policy.  On the remaining charges of falsification of education transportation allowance vouchers and Cost of Living Allowance vouchers, the Board did not credit the employee's claims that she was either unaware of the relevant regulations regarding these allowances or unaware that her husband had provided false information to her that she then submitted on the vouchers.

With respect to the whistleblower retaliation defense, the Board concluded that grievant did, in fact, make protected disclosures in connection with two audits of programs in Madagascar and in South Africa and that the subsequent recommendation to separate her was an adverse "personnel action."  The Board concluded, however, that there was insufficient evidence that any of the individuals involved in the personnel action were aware of her protected disclosures.  While the investigation against the employee was unusually hasty and very broad, the Board found that the employee failed to present preponderant evidence that any of the investigators were aware of, or acting in reprisal for, her protected disclosures.

The Board finds that the OIG has established sufficient cause to justify the proposal to separate the charged employee.

## DECISION

### I.      THE ISSUE

The charged employee challenges a decision by her employer to separate her for cause on

two misconduct charges.  The Foreign Service Grievance Board (FSGB, Board) concluded that

the agency carried its burden of proving four of five specifications of misconduct.  The Board

also concluded that the charged employee failed to present persuasive proof that either the

investigation into her conduct or the recommended discipline was the result of whistleblower

retaliation.

### II.      PROCEDURAL BACKGROUND

Likza Iglesias, (the charged employee, grievant),[1] joined the Office of the Inspector

General (OIG) at the United States Agency for International Development (USAID) in 2006 as

an auditor.  She was subsequently assigned to the Office of the Regional Inspector General (RIG)

at the USAID Mission in Cairo, Egypt.  In 2009, she was assigned, via direct transfer, to the

RIG's Office at the USAID Mission in Pretoria, South Africa.  Based on information provided

by grievant, her travel orders listed her eligible dependents as including: her husband, Ricardo,

her two young daughters, Vanessa and Alexa, her step-daughter, Taja, and her mother, Silvia

Nasser.  Taja did not travel to either Cairo or Pretoria with the rest of the family because she was

reportedly in school in the United States.  Mrs. Nasser traveled to South Africa with the family,

but, according to the case record, left post for extended periods of time to visit other relatives.

In 2010 and early 2011, grievant conducted two audits in the southern African region:

one of a USAID family planning program in Madagascar and one of a program to fund the

purchase of antiretroviral drugs for an HIV treatment program under the President's Emergency

---

[1] Throughout this decision, we refer to Mrs. Iglesias, without distinction, as either "the charged employee" or "the grievant."

Program for AIDS Relief (PEPFAR) in South Africa.[2]  Grievant identified problems with both

programs and brought her concerns to the attention of her supervisors.  In both instances, her

supervisors declined to include her concerns in the final audit reports.

        In June 2011, Pretoria-based OIG Special Agent (SA) Connor Cherer opened an

investigation into Mrs. Iglesias' educational transportation allowance submissions based on an

anonymous tip he received.  The informant reported that, although grievant was claiming

entitlement to the allowance for a driver to transport her children to and from school each day, in

fact her husband was driving them to school in the mornings.  Mr. Cherer arranged for

surveillance of Mr. Iglesias and determined that he was in fact driving his children to school.

Mr. Cherer also obtained grievant's monthly educational transportation vouchers and confirmed

that she had submitted several on which she claimed that her driver was transporting the children

to and from school each day.

        In August 2011, Special Agent in Charge of Investigations (now Deputy Inspector

General for Investigations) Lisa McClennon visited Pretoria on what the agency claims was a

routine site visit of her posts of responsibility.  Shortly after arriving at post, Ms. McClennon

concluded that the investigation into grievant's vouchers was not progressing sufficiently.  Thus,

she took over the investigation from SA Cherer and expanded it to include a review of all

vouchers and financial requests that grievant had submitted while in South Africa.  Within one

week, Ms. McClennon conducted over a dozen interviews, uncovered additional wrongdoing by

grievant, and flew to Italy, where the Iglesias family was on R & R, to interview Mr. and Mrs.

Iglesias.  Shortly thereafter, Ms. McClennon advised then-Acting Inspector General (AIG) of

---

[2] The South Africa audit is sometimes referred to in the parties' filings as the "Southern African" audit.  Whether the audit was of a regional ("southern African") program or a bilateral ("South African") one is irrelevant to this case. For simplicity, we refer to it as the South Africa audit throughout this decision.

USAID, Michael Carroll, of her findings, and Mr. Carroll ordered Mrs. Iglesias' tour in Pretoria

to be immediately curtailed.  Mrs. Iglesias and her family returned to Washington, D.C.

On December 20, 2011, AIG Carroll proposed to remove Mrs. Iglesias from her position

based on the findings of the investigation.  He eventually proposed her separation based on two

charges:  conduct demonstrating untrustworthiness, unreliability, or use of poor judgment, under

3 FAM 4377, No. 4, and intentional false statement or misrepresentation concerning a material

fact on any official form, such as pay or leave records, travel vouchers, reimbursement of

expenses, eligibility for allowances, etc., under 3 FAM 4139.2.  Under each charge, the same

five specifications were cited:  the first three alleging submission of false education

transportation allowance expenses, a fourth allegation of failing to accurately report family size

when requesting larger housing, and a fifth allegation of submitting false Cost of Living

Allowance (COLA) reimbursement forms.

The charged employee responded to the proposal on February 21, 2012, with the

assistance of counsel, explaining that as to the first three specifications, she was unaware, until

the investigation of her vouchers, that her husband had given her incorrect information, based

upon which, she filed incorrect vouchers.  Grievant admitted inadvertently requesting

reimbursement for transportation of her children at a time when her husband was driving them at

least one way to school.  She also admitted mistakenly submitting a voucher for transportation of

her children during the month before the date when her driver began working for the family and

for one week when school was not in session.  She further claimed that she was told by the

Regional Controller that it was proper to submit vouchers for transportation of her children to

extracurricular activities, after school and sometimes away from school property.

As for specifications 4 and 5, regarding the number of dependents who were at post for purposes of requesting housing and submitting COLA forms, Mrs. Iglesias claimed that she was unfamiliar with the applicable regulations and did not intentionally submit false or inaccurate vouchers.  Instead, she claimed that she was honestly mistaken about what was required.

Mrs. Iglesias also claimed that the charges against her resulted from an "overzealous investigation" of her financial documents because her supervisor, RIG Byrne, and SA Cherer were both biased against her.  She explained that SA Cherer had negative feelings toward her because she had previously questioned some of his travel vouchers and reported concerns raised by two female employees at post about his behavior toward them.  With respect to RIG Byrne, Mrs. Iglesias claimed that this supervisor expressed disdain for her accented English and required that she attend an English language class normally attended by administrative staff.

More than three months after responding to the charges, in June 2012, the charged employee filed notice, under the Whistleblower Protection Act (WPA), 5 USC § 2302(b)(8), claiming that she was the victim of retaliation by OIG as "a direct result of the perception held by Mrs. Byrne and others, of her as a 'trouble maker' for attempting to disclose [audit] information."[3]

On August 3, 2012, Mr. Carroll, who by then was no longer AIG and had resumed his duties as Deputy Inspector General (DIG)[4] of USAID, notified the charged employee by letter that he was recommending her separation, and immediately placed her on Leave Without Pay status, effective August 5, 2012.  On September 25, 2012, Mr. Carroll notified this Board of his recommendation to separate Mrs. Iglesias for cause, as prescribed in 3 FAM 4364.

---

[3] See, separation for cause action at Tab C, "Supplemental Response to Proposal to Remove," a letter, dated June 5, 2012, from Daniel S. Crowley, grievant's attorney, to the Disclosure Unit of the Office of Special Counsel, at p. 3.
[4] Mr. Carroll's "acting" status had expired under the terms of the Federal Vacancy Reform Act.

In its letter, dated October 9, 2012, acknowledging receipt of the notice recommending separation from USAID/OIG, the FSGB sought briefs from both parties on the question whether the USAID DIG was authorized by law or delegation to recommend the separation for cause of a Foreign Service employee.  After receiving briefs from both parties, the Board, in an order dated March 27, 2013, dismissed without prejudice the separation recommendation as outside of Mr. Carroll's authority as DIG.[5]

Mr. Carroll was thereafter nominated by the President to become the Inspector General at USAID.  On June 10, 2013, after resuming the position of AIG, Mr. Carroll ratified his previous recommendation to separate the charged employee for cause.[6]  USAID/OIG moved to reinstate the separation case against Mrs. Iglesias on June 14, 2013.  On August 20, 2013, the Board reinstated the case and began working with the parties to set discovery and hearing schedules.

The Board conducted a hearing in this case from July 28 through 31, 2014.  Post-hearing briefs were filed in October 2014.  Shortly thereafter, as the panel was preparing a final order, we were advised that Mr. Carroll had announced that he was withdrawing his name from the Senate IG confirmation process following publication of news articles accusing him of misconduct vis-à-vis OIG audit reports.  The President formally withdrew Mr. Carroll's name from Congressional consideration on November 12, 2014 and Mr. Carroll retired from USAID, effective December 31, 2014.

The charged employee next filed motions for leave to file a supplemental memorandum and to reopen discovery, basing these requests on "important new facts" that had come to light after the hearing.  Given Mr. Carroll's retirement and departure from USAID/OIG, the Board

---

[5] See the Board's Order:  Authority to Recommend Separation, dated March 27, 2013, in which the Board concluded that Mr. Carroll's proposal for Mrs. Iglesias' separation, issued while he was AIG, was valid, but that his recommendation for her separation, issued after the expiration of his "acting" status, was not.
[6] Mr. Carroll's status as a Presidential nominee restored him to AIG status and, thus, restored his authority to recommend the separation of USAID/OIG Foreign Service employees.

asked the parties to brief the question of who, if anyone, at USAID/OIG had the authority to prosecute the instant case after Mr. Carroll's retirement on December 31, 2014.

On April 27, 2015, the Board issued an order declaring that the authority to conduct personnel actions, including separation for cause, had been properly delegated on January 15, 2015 by the USAID Administrator to Ms. Catherine Trujillo, who was at that time both AIG and DIG for Operations.  In response to the charged employee's request to file a supplemental memorandum and to reopen discovery, the Board granted both motions in part.

In the April 27, 2015 order, the Board reconsidered a prior decision denying grievant's request to take depositions of two agency witnesses (SA Cherer and Audit Manager, Robert Mason) because their testimony pertained only to the whistleblower retaliation (WBR) defense. The Board had inquired whether there was any evidence that Mr. Carroll was personally aware of grievant's alleged protected disclosures.  Because she did not have such proof, grievant withdrew the defense.  Upon reconsideration, however, the Board concluded, based on pertinent cases, that actual personal knowledge by the decision maker (AIG Carroll) was not the only basis for proving whistleblower retaliation.  Citing *Whitmore v. Department of Labor*, 680 F.3d 1353 (Fed. Cir. 2012), the Board ruled that, even where there is no evidence that the decision maker had direct knowledge of protected disclosures when he proposed discipline for the whistleblower, and therefore, where there is no direct evidence that the decision maker had a retaliatory motive, such a motive might be imputed to him if there is evidence that someone else with a retaliatory motive influenced the discipline process with knowledge of the protected disclosures.  Given these factors, the Board reversed its ruling on grievant's motion to depose the two USAID witnesses and granted her leave to do so.

Grievant's claim for additional discovery was based on her contention that the press articles surrounding Mr. Carroll's withdrawal of his name from Presidential nomination and his subsequent retirement "suggested" that the OIG had omitted information in its discovery responses critical to her whistleblower claim.  The Board disagreed, concluding that because grievant had not filed a motion to compel the agency to produce more information, despite a protracted discovery process, no additional discovery was appropriate at that late date.

We ordered the charged employee to promptly advise the Board, after the additional depositions were completed, whether she wished to reinstate her WBR defense.  Mrs. Iglesias deposed the two witnesses in June 2015 and subsequently informed the Board that she wished to reinstate the defense.  In addition, on June 30, 2015, she filed a motion for additional discovery from the agency and for leave to take two more depositions.  On August 3, 2015, she filed a motion to compel discovery seeking, *inter alia*, an order from the Board to compel answers from the two recent deponents to questions they had refused to answer in their depositions on advice of agency counsel.

In an order dated December 2, 2015, the Board issued rulings on these requests, granting grievant's demand for the investigative files of SA Cherer and Ms. McClennon, finding that they may be relevant to the issues in this case, or lead to the discovery of relevant information.  We denied all of grievant's other requests, including additional testimony from all witnesses, ordering only that the agency produce a declaration from Mr. Jonathan Schofield, SA Cherer's supervisor, describing Mr. Schofield's involvement in the investigation of grievant's vouchers, as well as his knowledge, if any, of grievant's audit disclosures.

While we denied grievant's request to compel additional responses from Messrs. Cherer and Mason, who had refused to provide any information about their knowledge of the

anonymous informant, we ordered the agency to answer five questions, *in camera,* about the identity of the source of the June 9, 2011 complaint about Mrs. Iglesias.  In response to that order, the agency provided answers to the Board's questions that we determined did not in any way transgress the confidentiality provisions of the Inspector General Act (IGA).  We therefore provided the responses to the grievant in a Supplemental Order, dated December 29, 2015.  In that order, we denied grievant's request for further deposition responses from Messrs. Cherer and Mason and concluded that USAID/OIG was not required to disclose to the charged employee the identity of the confidential source who had initially reported her for submitting incorrect educational travel vouchers.

On January 14, 2016, USAID/OIG filed a motion for summary judgment and a request for a briefing schedule prior to a hearing on the motion.  On January 26, 2016, the Board issued an order denying the motion for summary judgment on the ground that such a motion is not contemplated in the written policies and procedures of this Board.  We also ordered a prompt re-opening of the original hearing to take testimony and evidence solely on the WBR defense.

The hearing was re-opened from February 22, 2016 through February 24, 2016 and again on March 10, 2016.[7]  The parties filed additional post-hearing briefs and responses on May 4, 2014 and the Record of Proceedings was closed on September 12, 2016.

## III.    POSITIONS OF THE PARTIES

### A.  The Agency

USAID/OIG contends that it has proved all of the specifications on both of the charges against the charged employee, given her admitted submission of false and inaccurate education transportation and COLA vouchers while she served in South Africa, as well as her request for a larger house based on inaccurate information about her family size.  The agency argues that it

---

[7] The Board denied both parties' requests to call additional witnesses on the last day of the hearing.

not only proved all of the charges, but that most were not disputed by grievant during the initial 2014 hearing.  USAID/OIG maintains that if the Board agrees, it should uphold the recommendation to separate Mrs. Iglesias from the Service.

In response to the charged employee's argument that the two charges should be merged, the agency contends that because the two charges contain different elements of proof, they should not be merged.  USAID/OIG states that Charge 1 requires proof of untrustworthiness, unreliability or poor judgment, and Charge 2 requires proof of intent to deceive or misrepresent facts, or a reckless disregard for the truth.  Thus, according to the agency, this Board could find that the charged employee exercised poor judgment even if it did not find that she acted deliberately to defraud the government or with reckless disregard for the truth.

As for the affirmative defense of whistleblower retaliation, USAID/OIG makes several arguments:

1. Grievant's Expressed Audit Concerns Were Not Protected "Disclosures."

The agency contends that the charged employee did not make qualifying disclosures protected under the WPA because the issues raised were unprotected policy differences.  USAID cites *O'Donnell v. Merit Systems Protection Bd.*, 561 F. App'x. 926 (Fed. Cir. 2014) for its position that, "[A]n employee who discloses general philosophical disagreements with agency decisions or actions should not be protected as a whistleblower."  561 F. App'x. at 929-30.  The agency avers that grievant's concern about the South Africa HIV/AIDS program was a policy dispute that fell under the "policy exception" to the definition of protected disclosures under the WPA.[8]  The agency contends that grievant raised a policy disagreement with her managers about whether the Ambassador should have certified that the South African Government had made

---

[8] The agency notes that under 5 U.S.C. § 2302(a)(2)(D), a protected "disclosure" does not include policy disputes within the discretionary authority of a supervisor unless the dispute involves an alleged violation of law, or gross mismanagement, waste, abuse of authority, or danger to public health or safety.

"demonstrated progress in establishing a financial plan to avoid future shortfalls."  This certification was the prerequisite to releasing a $60 million tranche of the $120 million program grant from the U.S. government.

USAID notes that Mrs. Iglesias' supervisor, Robert Mason, apparently took her concerns seriously enough to consult the PEPFAR Legal Adviser at post and inserted a memorandum concerning that consultation into the audit file.  Ultimately, he concluded that grievant's concern should not be stated in the audit report.  According to USAID/OIG, Mrs. Iglesias read this memorandum and made no comment or notes about it in the audit file, further proving that she recognized her concern as a policy disagreement.

With respect to the Madagascar audit, the agency likewise argues that grievant's concerns fell outside of the whistleblower protection arena because they pertained to "political risks routinely taken by USAID in aiding the developing world."[9]  Mrs. Iglesias stated that she was concerned that a significant number of contraceptives were purchased without determining that they met government standards and remained in storage until they were about to expire.  She concluded that the audited program wasted $100k worth of birth control supplies that became unusable because of a change in the law enacted by the Malagasy government.  USAID/OIG argues that this concern also amounted to a policy disagreement and therefore failed to qualify as a whistleblower disclosure.  The agency contends that after grievant raised a concern about the Madagascar audit with her two supervisors, RIG Byrne made the decision not to include a finding in the audit report and grievant took no further action at the time.

---

[9] *See* Agency Post-Hearing Brief, dated April 20, 2016, at p. 4.

2.  Grievant Failed to Prove a Nexus Between Her Alleged Disclosures and the Recommendation to Separate Her from the Service.

USAID/OIG contends that grievant was unable to show that anyone involved in the ultimate recommendation to separate her had knowledge of her alleged whistleblower disclosures.  The agency states it is "undisputed" that Mr. Carroll did not know about Mrs. Iglesias' audit concerns, even accepting, *arguendo*, that her concerns were protected disclosures.  As to the possibility that knowledge of grievant's concerns can be imputed to Mr. Carroll, the agency claims that "there is no evidence that anyone who was aware of grievant's alleged disclosures – Robert Mason, Christine Byrne, or Reyna Font (secretary to the Deputy Chief of Mission (DCM)) – had any influence whatsoever on the decision to investigate her or on Mr. Carroll's decision to recommend that she be separated for cause."[10]

3.  Grievant Failed to Establish a Retaliatory Motive.

The agency contends that employees such as auditors must meet a higher standard of proving that disclosures that are made in the course of normal duties are protected under the WPA.  Rather than merely proving that the protected disclosures contributed to the decision to take an adverse personnel action against the whistleblower, USAID/OIG argues that a higher standard was set by the Whistleblower Protection Enhancement Act (WPEA) of 2012, Pub. L. 112-199 (Nov. 27, 2012) for auditors and other employees who disclose waste, fraud and mismanagement during the course of their regular duties.  According to the agency, auditors and employees who make disclosures during the course of their regular employment must prove reprisal, that is, a retaliatory motive on the part of the individual taking the adverse personnel action.  The agency cites the Senate Report on the WPEA as explaining this change:  "This

---

[10] *Id*. at 243.

provision [5 U.S.C. §2302(f)(1)(F)(2)][11] is intended to strike the balance of protecting

disclosures made in the normal course of duties but imposing a slightly higher burden to show

that the personnel action was made for the actual purpose of retaliating against the auditor for

having made a protected whistleblower disclosure."  USAID/OIG also relies on *Benton-Flores v.*

*Department of Defense*, 121 M.S.P.R. 428, 2014 MSPB LEXIS 5223 (July 31, 2014) in support

of this position.

USAID argues that grievant admitted during the February 2016 hearing that she did not

believe that Ms. Byrne, Mr. Mason, or anyone else had retaliated against her.  In addition, even

after claiming very late in the hearing that it was Donald H. Gips, U.S. Ambassador to the

Republic of South Africa, who retaliated against her, the agency contends that grievant was

unable to prove that the Ambassador was even aware of her alleged disclosures.  In sum, the

agency contends, there was no evidence at all to support a finding that anyone who was involved

in the disciplinary action against grievant, including the investigators, had a retaliatory motive.

4.  Grievant's Testimony Lacked Credibility.

USAID/OIG points out that in grievant's February 21, 2012 response to Mr. Carroll's

December 20, 2011 proposal to separate her for cause, she made no mention of any

whistleblower retaliation claims.  Instead, she stated at that time, in a letter submitted on her

behalf by her current counsel, that the charges were the result of an "overzealous" investigation

by SA Cherer and Ms. Byrne, motivated by their personal biases.  The agency also notes that

grievant made no claims of whistleblower retaliation at an April 12, 2012 oral hearing on the

---

[11] 5 USC § 2302(f)(1)(F)(2) states:

> If a disclosure is made during the normal course of duties of an employee, the disclosure shall not be
> excluded from subsection (b)(8) if any employee who has authority to take, direct others to take,
> recommend, or approve any personnel action with respect to the employee making the disclosure, took,
> failed to take, or threatened to take or fail to take a personnel action with respect to that employee *in*
> *reprisal for* the disclosure.

(Emphasis added).

separation proposal that was held by OIG management.  It was not until June 5, 2012 that she

filed a whistleblower retaliation complaint with the U.S. Office of Special Counsel (OSC), a

complaint the agency labels "a completely different story of alleged retaliation" from what she

had previously claimed.  USAID/OIG also states that in grievant's 2014 deposition and during

her hearing testimony in February 2016, she "repeatedly impeached" her OSC complaint by

testifying that neither of her supervisors – Mr. Mason or Ms. Byrne – had retaliated against her.

USAID/OIG further contends that grievant's claims that she raised concerns about the

South Africa audit in the early first drafts of the audit report are belied by the TeamMate[12] file

containing the full record of that audit.  According to the agency, there is no mention in the audit

record of grievant's concern that the Ambassador had improperly approved the progress made in

the HIV/AIDS program, or her concern that taxpayer funds were being wasted in the amount of

$100 million dollars.  Both Ms. Byrne and Mr. Mason testified that, after reviewing the audit

record, they were certain that grievant did not write anything about her concerns into the audit

record.

### B.  The Charged Employee/Grievant

In her testimony, grievant largely admitted the voucher errors and many of the other

factual specifications, but asserts that her voucher errors were the result of inadvertence and

mistake.  She also stated that she was unfamiliar with the COLA regulations and did not

intentionally misrepresent the number of eligible family members who were with her at post.

She claimed that the investigation of her vouchers was initiated and expanded in retaliation for

her whistleblower disclosures to her supervisors during the two audits in South Africa and

Madagascar.

---

[12] Witnesses explained that the TeamMate file was an electronic record of all of the written activity pertaining to each audit.

The charged employee asks this Board to merge the poor judgment charge with the false submission charge on the ground that the same facts that prove the latter prove the former.  She does not argue that one charge is a lesser included offense of the other, that is, that all of the elements of one charge are included among the elements of the other.  Instead, she contends that merger is appropriate because the exact same conduct is offered to prove both charges and proof of one charge automatically proves the other.  She cites several MSPB cases in support of her position, including *Shiflett v. Department of Justice,* 98 M.S.P.R. 289, 2005 MSPB LEXIS 847 (March 14, 2005), in which the MSPB held:  "The [MSPB] will 'merge' charges if they are based on the same conduct and proof of one charge automatically constitutes proof of the other charge."  98 M.S.P.R. at 292, 2005 MSPB LEXIS 847 at 3.  She also cites *Gunn v. United States Postal Service,* 63 M.S.P.R. 513, 1994 MSPB LEXIS 963 (July 12, 1994), in which the MSPB held:

> We discern no error in the merging of this charge [of unacceptable conduct] into the other two charges [of falsification and providing false information in an investigation] … because the agency did not accuse the appellant of any specific misconduct under the unacceptable conduct charge in addition to its previous allegations that she falsified a leave form and provided false information in an agency investigation.

63 M.S.P.R. at 517, 1994 MSPB LEXIS 963 at 5.

With regard to her affirmative defense of whistleblower retaliation, grievant contends that she has shown that her disclosures were protected under the WPA and contributed to the decisions to propose and recommend her separation from the Foreign Service.  She also contends that her disclosures to the RIG, Christine Byrne, indirectly to Ambassador Gips, and others[13]

---

[13] Mrs. Iglesias claims that she shared her concerns about the South Africa audit with her supervisor, Audit Manager Robert Mason, with the RIG, Christine Byrne, with individuals who were helping to administer the South Africa HIV PEPFAR program, as well as with the secretary to the DCM, Reyna Font, who grievant claims told her that she had discussed the audit concerns with Ambassador Gips' secretary.  While grievant did not attempt to prove that Ms. Font in fact repeated her concerns to the Ambassador's secretary, or that the latter then discussed these concerns

were the reason she was investigated so expansively, curtailed from South Africa before the conclusion of the investigation, and ultimately recommended for separation.  The investigation, she avers, was used as a tool to retaliate against her.

The charged employee argues that the agency is grasping at legal straws to overcome her proof of whistleblower retaliation.  She contends that many of the cases cited by USAID/OIG are either non-precedential or have been expressly overturned by subsequent cases and/or statutes.  Grievant argues that the agency has made no attempt to explain why Ms. McClennon took over the investigation in the first place when it had been in Mr. Cherer's portfolio; why the investigation was expanded; or why the decision to curtail her was made before she had even been interviewed.  She claims that the agency knows that Ms. McClennon was "not a credible witness."[14]  In sum, she asserts she has proved whistleblower retaliation and USAID/OIG did not prove that she would have been investigated and recommended for separation in the absence of her whistleblowing.  Her arguments are as follows:

1. <u>The Audit Disclosures Are Protected under the WPA.</u>

Grievant disputes the agency's claim that her audit concerns were no more than policy disagreements and therefore are not protected "disclosures" under the WPA.  She argues that the WPEA, its legislative history, and subsequent court decisions all clarify that disclosures of gross waste and mismanagement are protected, even if they are related to policy matters.  She asserts that USAID/OIG relies incorrectly on *O'Donnell v. Merit Systems Protection Board*, *supra*, which is a case that does not, in her view, stand for the proposition that policy disputes between

---

with the Ambassador himself, she argues in her post-hearing brief that it is "not believable," given his interest in PEPFAR programs and frequent interactions with USAID and PEPFAR officials, that Ambassador Gips did not learn about her protected disclosures.  *See,* Grievant's Second Post-Hearing Brief at p.20.

[14] *See,* Grievant's Reply to the agency Post-Hearing Brief, dated May 4, 2016, at p. 2.

an employee and a supervisor are not protected, but instead turns on whether the subordinate "reasonably" believed that his supervisor's policy disagreement was a violation of law.[15]

   She further argues that Mr. Mason's decision to discuss her concerns with the PEPFAR lawyer proves that he understood her concerns to involve more than a policy dispute.  Grievant argues that she was prepared to report that the conditions for disbursing HIV/AIDS funds had not been met and therefore, she had a reasonable belief that she was disclosing gross waste and mismanagement (of approximately $120 million), as required by the WPA.  In addition, she argues that, contrary to the agency's arguments, the law does not require that she make her disclosure to a person with the authority to act to remedy it.  (Hrg. Transcript ("Tr."), February 23, 2016 at p. 104).

   2.   Grievant Established a Nexus Between the Protected Disclosure and the Investigation.

   Grievant contends that, contrary to the agency's argument that the deciding official must have had personal knowledge of the employee's protected disclosures, the law has "long been crystal clear" that constructive knowledge is sufficient.  *Citing Harvey v. Merit Sys. Prot. Bd.*, 802 F.2d 537, 547 n.4; *Bodinus v. Dep't. of the Treasury*, 7 M.S.P.R. 536 at 541, 1981 MSPB LEXIS 423 at 7-8 (August 27, 1981); and the WPEA, she contends that constructive knowledge may be shown by proving that her protected disclosures were a contributing factor in the decision to conduct or expand the investigation, which, in turn, led to the adverse personnel action.  The nexus between the protected disclosures and the investigation would be imputed to the decision to separate her.

   Grievant dismisses the argument by USAID/OIG that the WPEA demands a higher standard of proof for whistleblowers who, like herself, make disclosures in the regular course of

---

[15] The Federal Circuit Court of Appeals in *O'Donnell,* stated:  "[A]n exercise of discretionary authority [by a supervisor] is not a 'violation of the law.' … [T]he legislature also included language to make sure a supervisor's discretionary decisions are not challenged by subordinates."  *Id.* 561 F. App'x. at 930.

their duties.  Nonetheless, she states even if the WPEA does impose a higher standard of proof,

that law was enacted the year after Mr. Carroll proposed her separation and is not by its terms

retroactive.  Lastly, she argues, even if the Board rules that the WPEA should be applied

retroactively, it would not apply here because she made her disclosures outside of her normal

supervisory channels.  She argues that, when her audit manager and the RIG refused to include

her concerns in either audit report or in management letters to the clients, she reported her

concerns outside of USAID/OIG, by informing her friend, Reyna Font, the DCM's secretary,

asking that she bring her concerns to the attention of the Ambassador.

3.   Circumstantial Evidence of Retaliation.

Grievant argues that she has shown a "mosaic of circumstantial evidence" that proves her

disclosures were the reason for the investigation into her vouchers and, subsequently, the

personnel action taken against her.  As an initial matter, she challenges the agency's reliance on

her lay understanding of whistleblower law when she testified in her deposition that she believed

that the separation recommendation was not made "in reprisal" for her disclosures.  Grievant also

rejects the agency's conclusion that Ms. Byrne did not retaliate against her simply because Ms.

Byrne gave self-serving testimony that was contradicted by other evidence.  While Ms. Byrne

claimed in testimony that she "liked" Mrs. Iglesias and said she was a good auditor, grievant

contends that that testimony is belied by the fact that the RIG told investigators that she had an

"uneasy" feeling about her because everything she did, while within the letter of the regulations,

required an exception or additional research before it could be approved.

Grievant also disputes the agency's claim that Ms. Byrne was unaware of her disclosures.

Mrs. Iglesias cites both documentary and testimonial (hearing) evidence that she says establish

that Ms. Byrne was well aware of her audit concerns, even if there was nothing in the audit file documenting her concerns.

Mrs. Iglesias also avers that Ambassador Gips was one of the persons who retaliated against her because of her disclosures.  She claims that it "defies logic" that the Ambassador, with a deep interest in the politically important PEPFAR South Africa HIV/AIDS program, was unaware of her audit concerns that $120 million U.S. taxpayer dollars were, in her view, being wasted on a program that did not meet the criteria for a release of the funds.  She cites the fact that Ambassador Gips met twice with Ms. McClennon when she was in South Africa at a time when she was making the decision to take over and expand the investigation into her financial submissions.  This, she contends, supports a finding that the Ambassador encouraged the investigation in reprisal for her audit complaints.

Lastly, grievant argues that USAID/OIG has not demonstrated that her whistleblower complaint was raised so late in the process of her discipline that it lacks credibility.  She claims that, despite the fact that she filed her whistleblower complaint several months after she was proposed for separation and did not mention it in her initial response to that proposal, she is allowed to supplement her defense, which she sought leave to do four months later in June 2012.

## IV.   DISCUSSION AND FINDINGS

### A.  The Charges Against Grievant

USAID/OIG has charged Mrs. Iglesias with submitting numerous false or inaccurate forms and vouchers, which resulted in her having received payments and reimbursements for overseas allowances in excess of that to which she was entitled.  She is also charged with requesting larger housing for herself and her dependents in excess of that to which she was

entitled based on the number of family members who were actually with her at post.  The two

counts are:

>   Charge 1: Conduct demonstrating untrustworthiness, unreliability, or use of poor
>            judgment.  3 FAM 4377, No. 42, and
>
>   Charge 2: Intentional false statement or misrepresentation concerning a material
>            fact on any official form, such as pay or leave records, travel vouchers,
>            reimbursement of expenses, eligibility for allowances, etc.  3 FAM
>            4139.2.

On each charge, Mrs. Iglesias was cited with five specifications summarized in detail as

follows:

1. False Education Allowance Claim for Transportation Expenses – submission of
   transportation expenses from January 17, 2011 to January 31, 2011, when the driver
   was not hired until February 14, 2011.

2. False Education Allowance Claim for Transportation Expenses – submission of
   claims for transportation that included transportation to extra-mural activities
   (swimming, music, choir) and other duties beyond transportation (helping with
   homework, doing personal errands, filing).

3. False Education Allowance Claim for Transportation Expenses – submission of
   expenses for transportation in April 2011 when school was not in session.  The
   children's school was in session four days in April and six days in June 2011.  The
   April 2011 invoice was more than double the June invoice and included days when
   school was not in session.

4. Failure to Report Change in Household Size – grievant's travel orders authorized five
   eligible dependents to accompany her at post:  her spouse, two daughters, one step-
   daughter and her mother.  Grievant submitted a request for larger housing, claiming
   that all five eligible dependents lived with her at post in a house that allegedly had
   insufficient bedrooms in the "safe haven" part of the home.  In fact, grievant's step-
   daughter was never at post, but was reportedly in school in the U.S., and her mother
   did not spend at least fifty percent of the preceding year at post.  Based on grievant's
   submission, USAID purchased and made ready a larger home for the Iglesias family
   at significant expense to the agency.

5. Submission of Incomplete COLA Request Forms – Grievant submitted 24 COLA
   request forms on which she certified that her eligible dependents were with her at post
   during each month, omitting to submit information concerning the arrivals and
   departures of her eligible dependents from post.  Grievant was not entitled to receive
   COLA for family members who were away from post more than 30 consecutive days.

### B. Burden of Proof, Elements and Merger

In a case involving a recommendation to separate an employee for cause, the agency bears the burden of proving, by a preponderance of the evidence, that the proposed separation is for such cause as will promote the efficiency of the Service. 22 CFR § 905.3. In disciplinary cases, at the grievant's request, the Board is required to conduct a hearing. 22 CFR § 906.2. At the conclusion of the hearing, if the Board determines that the agency has met its burden of proof, the Board would ordinarily affirm the recommendation. 5 CFR § 1201.56 (b) (1). However where, as here, an affirmative defense of whistleblower retaliation is presented, the case does not end at the conclusion of the evidence on the charges. *Whitmore v. Department of Labor, supra,* 680 F.3d at 1367. Where whistleblower retaliation is claimed by an employee, s/he then bears the burden of establishing by preponderant evidence that: (1) she made a protected disclosure under the WPA; (2) she was subsequently the subject of an adverse "personnel action" and (3) the protected disclosure was a "contributing factor" in the decision to take that action.[16] If the charged employee proves these three elements, the agency then is afforded an opportunity to prove by clear and convincing evidence that it would have taken the same personnel action, absent the disclosures. *Id.*; 5 USC § 1221 (e).

The parties argue about the nature and quantum of proof necessary to establish the two charges. Mrs. Iglesias contends that to prove the charge of Intentional False Statement or Misrepresentation, USAID/OIG must prove that she knowingly submitted vouchers containing false material facts with the intent to deceive or defraud her employer. She argues that her

---

[16] The parties argued about whether the standard of proof was for the charged employee to establish that her protected disclosures "contributed" to the decision to investigate and/or recommend her for separation, as required under the WPA, or whether the standard is that she prove that the investigators and/or decision maker had a retaliatory motive, as required under the WPEA. Because we find that the charged employee did not establish the lesser standard of proving "contribution," by definition, she did not prove the greater standard of "retaliatory motive" and do not decide which standard applies here.

employer cannot prove that she was aware that her vouchers were false at the time she submitted them.  In fact, she argues, she was simply confused about what the regulations required.

USAID/OIG argues that the intent element of the second charge can be inferred from evidence that grievant exercised "reckless disregard for the truth."[17] The agency contends that Mrs. Iglesias engaged in a persistent pattern of conduct that always inured to her financial benefit, thus "suggesting" that her intention to defraud, deceive or mislead was deliberate.  *Id.* USAID lastly argues that the Board may infer deliberate intent to deceive and defraud based on the "evasive, inconsistent, and inherently incredible" testimony offered by grievant.

The Board finds that both parties are correct.  The terms "falsification," "misrepresentation" and even "fraud" are often used interchangeably in the administrative agency case law.[18] In cases involving employment grievances and discipline, "falsification," "making false statements" and "intentional misrepresentation" are the terms most commonly applied and have the same elements of proof.  In these cases, the employer must prove that the employee:  (1) supplied wrong information, (2) knowingly, and (3) with the intention of defrauding, deceiving, or misleading the agency.[19] "To prove intent, the agency must show that the [grievant] not only intended to defraud, deceive, or mislead the agency, but that she did so for her own "private material gain."[20] The cases hold that mistakes are not sufficient to prove intentional misrepresentation,[21] however intent can be proved circumstantially.[22]

---

[17] *See* Agency's Post-Hearing Brief, dated September 29, 2014, at p. 3.

[18] *See, e.g., Gustave-Schmidt v. Dep't of Labor*, 87 M.S.P.R. 667 at 674, 2001 MSPB LEXIS 229 at 8, n2 (March 12, 2001) ("The criteria for establishing a charge of misrepresentation are the same as those for establishing a charge of falsification.").

[19] *See Boo v. Department of Homeland Security*, 122 M.S.P.R. 100 at 106, 2014 MSPB LEXIS 9033 at 10 (December 3, 2014) *quoting Leatherbury v. Department of the Army*, 524 F.3d 1293, 1300 (Fed. Cir. 2008).

[20] *Id.*, 2014 MSPB LEXIS 9033 at 11.

[21] *See Johnson v. Department of Navy,* 2006 MSPB LEXIS 1794 (May 3, 2006) at 7-8. ("That the supplied information was incorrect is not alone sufficient to sustain the charge and plausible explanations must be considered.).

Grievant argues that the two charges are "largely indistinguishable" from one another and should merge.[23]  The agency opposes this request.  The Board has reviewed the relevant MSPB cases and concludes that the two charges should be merged because although, as the agency argues, it is possible to prove poor judgment without finding a deliberate and intentional desire to falsify the financial submissions, the contrary is not true.  If the Board finds that the charged employee either deliberately submitted false documents with the intent to deceive her employer and receive reimbursements to which she was not entitled, or acted with reckless disregard for the truth of her submissions, this proof automatically establishes that she used poor judgment in each instance.  *Shiflett v. DOJ*, *supra.*  Accordingly, we review the evidence presented to determine whether the agency has proved all five specifications under the greater charge of intentional submission of false benefit requests.

### C.  Findings on the Charges

After reviewing all of the testimony adduced from the witnesses, the exhibits admitted into evidence, and the pre- and post-hearing submissions from the parties, the Board makes the following findings of fact:

1.  Education Transportation Allowances.

We conclude that USAID/OIG proved Specifications 1-3 – that grievant knowingly submitted false vouchers for transportation expenses for a period of time before her driver began transporting the children and for duties other than transportation of the children, as well as for transporting the children to extracurricular activities away from school and on days when school was not in session.  We conclude that Mrs. Iglesias submitted these vouchers for six months with the intent to deceive her employer and to receive reimbursement funds to which she was not

---

[22] *Id.* at 8 ("Intent may be established by circumstantial evidence and may also be inferred when a misrepresentation is made with a reckless disregard for the truth or with a conscious purpose to avoid learning the truth.").
[23] *See* Grievant's Pre-Hearing Brief, at p. 7.

entitled.  We do not credit her claim that she was unaware of the facts and relied instead on her husband's preparation of invoices.  Nor do we credit her claims that she was unaware of the rules and regulations governing the COLA requirements.

At the initial hearing in July 2014, Mary Lee Lewellen testified that when new employees arrived at post, they were instructed by the Financial Management Office (FMO), the Comptroller's Office and the Executive Office about allowances to which they are entitled. Employees were also referred to additional information about allowance regulations on the State Department intranet, the Automated Directives System (ADS) at USAID, standardized regulations (DSSR) prepared by the State Department, as well as the Foreign Affairs Manual (FAM) and the Foreign Affairs Handbook (FAH).  (Tr. July 28, 2014 at 65-67).

With regard to education transportation allowances, Ms. Lewellen testified, without dispute from the charged employee, that in instances where an employee's children do not attend the American School, as was the case with grievant here, the employee would initiate a request for reimbursement for transportation of his or her children, by submitting a form SF1190 and would certify that the information on the form was accurate.  Ms. Lewellen further explained that the purpose of the education transportation allowance is to give employees the same benefit of a free education to which their children would be entitled if they were in the U.S.  *See* DSSR § 272.1.  The allowance covers "local transportation on school days *between the school and the employee's home.* … [A] cents per mile rate may be reimbursed for *one round-trip per day between school and home*."  DSSR § 277.1(f) (emphases added).  The educational transportation allowance is not intended to cover after school care for children or transportation to activities after school and away from school grounds.  DSSR § 277.1(d) ("Fees not considered allowable include … items not ordinarily provided free of charge by public schools in the United States.").

Mrs. Iglesias testified that she failed to notice that her husband, who filled out the requisite reimbursement invoices, had requested reimbursement for employing a driver in January 2011, the month before the driver was actually hired, and for the first two weeks in February 2011, before the driver began actually transporting the children.  Grievant stated that she submitted the first vouchers for transportation reimbursement in April 2011; however, she admitted that she reviewed the invoices provided by her husband and copied the information onto the vouchers that she submitted.  Thus, her claim was that as she transcribed the data onto the voucher forms, she did not realize the mistake in the dates.

When questioned about why he prepared invoices for dates when the driver was not working, Mr. Iglesias testified that he did this in order to obtain reimbursement in advance of the driver's actual duty "because, in my experience, government always pays late."[24]  Essentially, he explained, he did not want to be "out of pocket" for the transportation expenses and elected to secure reimbursement in advance of incurring the expenses with which to pay the driver.  To compensate for the early reimbursement, he testified that he intended not to submit the last voucher for June.  In fact, a voucher was submitted for the period June 6 -13, 2011.  The Iglesias' testified that the driver was terminated "in early June."[25]

We do not credit Mrs. Iglesias' claim that she did not notice the dates she reported on the vouchers.  We find her excuse incredible because there were two vouchers (January and February) that claimed transportation expenses prior to the start date of the driver's contract that began on February 14, 2011.[26]  We find that grievant knowingly submitted false information on these two vouchers and, at a minimum, did so in reckless disregard for their accuracy.  Our

---

[24] Tr. July 29, 2014 at p. 124.
[25] Tr. July 28, 2014 at p. 298.
[26] The January voucher claimed transportation expenses from January 17 through 31, 2011.  *See,* AEx 3 at p. 1.  The February voucher claimed transportation expenses from February 1 through February 28, 2011.  *Id.* at p. 2.  The parties stipulated that the contract with the driver began on February 14, 2011.  *See,* AEx 11.

conclusion is further supported by the fact that Mr. Iglesias prepared a voucher for the period

before the driver's employment began, admitting that he sought to secure an advance of funds in

order not to have to use personal funds to pay the driver.[27]   Neither he nor the charged employee

offered any support for the legitimacy of this approach.

We consider additional proof of fraud that Mr. Iglesias stated that he intended not to

submit the last travel voucher (because he had requested and received advance reimbursements),

however, he concedes that he submitted a final request for reimbursement for the last few weeks

of the driver's employment in June.

Grievant suggested in her testimony that USAID/OIG should have noticed the difference

in the date when she first claimed transportation reimbursement and when the driver was hired

because she reportedly submitted a copy of the contract she executed with the driver to

accompany several voucher submissions.  The evidence, however, did not support her assertion

that she submitted copies of the contract for the driver along with her vouchers.  Besides,

grievant cannot transfer to her employer her own responsibility to accurately submit requests for

reimbursement.

The individuals responsible for receiving and maintaining the voucher documents at

USAID, Aroshna Sahadev (Supervisory Voucher Examiner, FMO) and Mary Lewellen (Acting

Mission Controller, FMO), both denied ever receiving a copy of grievant's contract with her

driver.[28]   In the end, we conclude that USAID/OIG proved that the vouchers on which grievant

claimed transportation reimbursement for a driver she had not yet hired were blatantly

---

[27] Mrs. Iglesias also testified that she was aware of the maximum allowable transportation allowance ($4000 per year).  She rationalized that the cost of the driver's monthly salary was less than the maximum allowance.  She testified that paying her driver monthly was "cheaper for us and for everyone.  I never thought I would reach the maximum allowed."  This, of course, demonstrates that grievant was familiar with the rules regarding the allowance.
[28] The two witnesses testified that every document submitted along with the vouchers was scanned into the electronic records and maintained for audit purposes.  When a search was conducted to determine what documentation was submitted by grievant, there was no record of any contract between grievant and her driver.

inaccurate, untruthful and were submitted with the intent to deceive the employer in order to receive funds to which grievant was not entitled.

Likewise, with respect to the filing of claims for the driver's other household duties, as well as for mileage and payment on days there was no school, Mr. Iglesias admitted to this. He stated that he asked the driver to assist the children with homework and, on occasion, asked her to help him file documents electronically. We did not credit Mrs. Iglesias' claim that she was unaware that her driver was performing other duties with the children and for her husband. She testified that by the time she arrived home, the driver was usually gone and, therefore, she did not see her help the children with their homework or file papers for her husband. However, the contract that she and her husband signed with the driver describes the latter's duties:

> ¶4.2 Driver shall be available from 1PM to 6PM to transport children from school to our home and other activities according to the schedule that will be provided by the parents.
> ¶4.3 Driver agrees to assist with the organization of any school and after school activities and *perform other errands from time to time if needed*.

(AEx 9) (Emphasis added).

Grievant's husband confirmed these duties in a letter of recommendation he wrote after terminating the driver's services. Mr. Iglesias wrote:

> Miss Bezuidenhoud[t] [the driver] has been working with us for the past six month[s]. Her main responsibility was to transport our girls from schools [sic] and to after school activities. … [S]he has showed [sic] to be a safe driver, and able to assist the girls with homework and school projects. … *[S]he did a great job at running errands and setting up an electronic filing system*. ….

AEx at 18. (Emphasis added). Given the record evidence, we conclude that USAID/OIG proved that Mrs. Iglesias was aware that her employee performed duties other than transportation and submitted unauthorized vouches for reimbursement for payments to the driver for these duties.

We also did not credit grievant's claim that she was told by the regional financial controller, Margaret Witherspoon, that she could be reimbursed for expenses associated with transporting her children to school-related activities that the school organized, in addition to driving them to and from school.  In her deposition, Ms. Witherspoon testified that based on her understanding of the regulations, reimbursement was not permitted for transportation to extracurricular activities away from school or on days when school was not in session.  (GEx 16).[29]  Based on this testimony, the Board found incredible grievant's claim that she was advised by Ms. Witherspoon contrary to the clear language, and her own understanding, of the applicable regulations.

We also find Mrs. Iglesias' statements that she was unaware of the regulatory requirements unpersuasive, particularly because of her many years of service as a trained auditor.  Grievant also testified that it was her practice to research benefits and allowances if she had a doubt or a question about them.  She admitted at the hearing in 2014 that in 2006, when she had an "education allowance question" concerning her youngest child, she inquired about the State Department regulations in an email conversation with the post IG's office after researching the regulations and attaching a copy of DSSR § 276.25.  In one email, she stated: "… I decided to contact you to see if there is a way to contact the State department and get an answer from them, since they are the owners of the regulations."  (AEx 20 at p. 9).  We conclude that grievant was, and certainly should have been, fully aware of the regulations, having researched them on some occasions when she was seeking an allowance.  Thus, since the regulations clearly restrict

---

[29] Ms. Witherspoon was asked if she recalled a conversation with the charged employee about educational transportation reimbursement and, specifically, whether she recalled telling Mrs. Iglesias about reimbursement for extracurricular activities.  She stated that she did not recall the conversation.  She did not deny that there was one, but did not recall it.  *Id.* at p. 13.

education transportation allowances to transportation of children on school days only to and from school, we conclude that grievant was aware of, and knowingly violated, them.

In sum, we find that the agency proved each specification (1-3) alleging wrongdoing with respect to grievant's submission of education transportation vouchers.  The evidence proves both charges of Conduct Demonstrating Poor Judgment and Intentional False Statements on Official Forms, but we conclude that Charge 1 is merged into Charge 2.

2.  <u>COLA Vouchers.</u>

With respect to the Post Allowance, or COLA, the Board concludes that USAID/OIG proved that Mrs. Iglesias failed to report on required monthly forms her mother's departures from South Africa for extended periods of time in excess of thirty days.  This resulted in Mrs. Iglesias receiving COLA payments for several months that were higher than that to which she was entitled.

Each COLA Request Form asks the employee to report the "number of dependents [in addition to the employee] present at post at the beginning of the month or beginning of the period for which COLA is requested."  The form also asks the employee to report the dates of departure and arrival for the employee and each dependent during the reporting month.  Grievant acknowledged in her testimony that she read the forms and was aware that she was supposed to "keep the dependency information current."  (Tr. July 29, 2014 at p. 279).  We base our conclusion regarding the COLA specification in part on a stipulation between the parties that Taja never lived at post in Pretoria and on testimony and exhibits that clearly show that Mrs. Iglesias' mother, Sylvia Nassar, spent considerable time away from post, but was not excluded from the number of dependents grievant claimed on the COLA forms.[30]  For example, the

---

[30] USAID/OIG presented evidence (AExs 21-4) of grievant's reports of eligible family members who she claimed were with her at post on forms called Foreign Service Residence and Dependency Reports (FSRDRs).  These reports

Agency's Exhibit No.7, introduced at the July 31, 2014 hearing, is a report of Mrs. Nassar's travel from March 2010 through May 2011. This travel report shows that grievant's mother arrived in South Africa on March 2, 2010 and left there on July 3, 2010. She returned on July 5, but left again on July 15, 2010. Mrs. Nassar did not return to post until October 19, 2010 and left South Africa again on November 20, 2010. She returned to post on April 11, 2011 and last left post on May 25, 2011. The travel report does not show her returning to post thereafter, although grievant testified that her mother returned in late August or early September 2011 and curtailed with the family. Thus, for the twelve months from January 2010 to January 2011, grievant's mother was with her at post for approximately four months.

During the periods of her mother's absence from post, grievant failed to report the reduction in the size of her eligible dependents on which the COLA is calculated. The Agency's Exhibit No. 6A, admitted during the July 31, 2014 hearing, includes the COLA forms at issue. The months when the forms were inaccurate include February and July 2010, when grievant reported five family members living at post (including herself), even though the only family members at post were herself, her husband and two younger daughters. Grievant's mother was not at post for the entirety of either of these months; thus, grievant was obligated to reduce the

---

were prepared and signed by grievant and indicate that at first, in August of 2006, Mrs. Iglesias reported to USAID that she was bringing her husband, two daughters, and step-daughter with her to her onward assignment in South Africa. (AEx 21). At the hearing, however, Mrs. Iglesias testified that she was aware before arriving in Pretoria that Taja was not going to accompany the family to post because she would have had to repeat the 11th grade. Grievant testified that Taja visited the family once in the summer of 2007, but otherwise never visited her family at post. Despite that, grievant wrote an email on March 18, 2009, stating: "Taja is attending school in the States – she comes during the year (summers, x-mast [sic], ++) and spends weeks or months with us . . . .!" (AEx 24). Grievant also submitted a second FSRDR in February 2009 (AEx 23) and an accompanying letter certifying that her mother, Silvia Nasser, was her dependent. This form did not acknowledge that Taja was not with her at post. Grievant testified: "I did not correct [the form vis-à-vis] Taja." The instructions for completing the FSRDRs read in part:

> A dependent may be a … child under the age of 21, or a relative who is at least 51% dependent on you for support …. Dependency information must be kept current. … **NOTE: Keeping dependency information up-to-date helps ensure the coverage of eligible dependents under your agency's medical program**. …

(AEx 22, at p. 3) (Emphasis in original).

total of family members from five to four on the February and July COLA forms.[31]  In October

2010, grievant submitted an early COLA report for November. She reported herself and her

husband as scheduled to be on home leave, beginning November 1, but did not indicate that her

mother planned to leave post in November as well.  Grievant reported three family members at

post, but it appears that at most her two younger daughters were there.

      In January 2011, two months after the fact, grievant reported her mother as departing post

on November 20, 2010, and again departing post on January 14, 2011.  Grievant did not report

her mother returning to post between the two departures dates on the January 2011 COLA form.

This is inconsistent with the Agency's Exhibit No. 7, introduced into the record of the July 31,

2014 hearing, which indicates that grievant's mother was not at post on January 14.  Instead, the

exhibit states that grievant's mother did not return until April 2011 from a November 2010

departure.  In any event, grievant did report her total family size as four for January 2011.

      Grievant's April 2011 COLA form reports a total of five family members, including

herself, with no arrivals or departures, despite the fact that her mother returned to post on April

11, 2011.  Grievant signed this form on May 3, 2011.  The May 2011 COLA form states that all

five family members were at post, despite the fact that Agency Hearing Exhibit No. 7, previously

referenced, also establishes that Mrs. Nassar left post on May 25 and the document was signed

by grievant on May 27, 2011.  Grievant submitted COLA forms in June and July 2011, claiming

five dependents, with no proof that her mother was at post during either of these months.[32]  We

are satisfied by the evidence presented that grievant knowingly failed to update the monthly

COLA forms to reflect when dependents were not at post, always to her financial benefit.  Thus,

we conclude that the agency has proved by preponderant evidence specification 5 – that grievant

---

[31] Grievant acknowledged that the February form was inaccurate.
[32] USAID/OIG also claimed that grievant did not report her own R&R, or that of her other dependents, nor did she
report dates when she was on TDY.  The evidence did not establish these additional claims.

deliberately submitted false COLA forms with the intent to deceive her employer into giving her additional benefits.

3. <u>Failure to Report Changes in Household Size When Requesting Larger Housing</u>

The agency also charged grievant with failing to report a change in her household size when she requested a change in housing, thereby misleading the Inter Agency Housing Board into assigning her family to a larger home, a move which cost thousands of dollars in new rental payments and make-ready charges.  The Board is not convinced that USAID proved that Mrs. Iglesias acted improperly in this regard.  The Embassy General Services Officer in charge of housing testified that the first home that post assigned to the Iglesias family was smaller than the maximum allowed for the family size.  In addition, the floor plans for the original home revealed there was no bedroom suitable for Mrs. Iglesias' mother within the safe haven portion of the house at this high-crime-threat post.  One small bedroom in the safe haven area of the house was not certified by the RSO as a sleeping area because the window in this room was too small to allow egress in case of fire.  Thus, although the evidence established that Mrs. Nasser apparently spent long periods of time away from South Africa, she, nonetheless, remained a "dependent" on grievant's travel orders.  Therefore, it was not unreasonable for the family to expect her to be at post for some time during this tour and for her to occupy sleeping quarters in the safe haven portion of the dwelling.  The agency's charge that grievant's desire for a larger residence cost the government approximately one hundred thousand dollars for the rent and make-ready costs of a newly-rented house is not sustained because the evidence proved that grievant was entitled to both a larger home and a sufficient number of bedrooms for her family with appropriate egress in the safe haven portion of her home.[33]

---

[33] We note that the Iglesiases originally requested permission to purchase a home on the local market, and only sought a larger Embassy-leased residence after that request was denied.  Grievant also argued that the agency

In the end, we find that USAID/OIG has proved by preponderant evidence four out of five specifications in support of its case for grievant's separation.  The next issue then, is whether grievant has proved her affirmative defense of whistleblower retaliation.

### D.  The Whistleblower Retaliation Defense

1. <u>Did Grievant Make Protected Disclosures?</u>

Under 5 USC § 2302(a)(2)(D), a protected disclosure is defined as:

> a formal or informal communication or transmission, but does not include a communication concerning policy decisions that lawfully exercise discretionary authority unless the employee or applicant providing the disclosure reasonably believes that the disclosure evidences—
> (i) any violation of any law, rule, or regulation; or
> (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

Disclosures of waste, fraud, and abuse discovered during the performance of an employee's normal duties, including as an auditor, and disclosures that are known by the employee's managers are protected under the WPA.  *See, e.g., Askew v. Dept. of Army,* 88 MSPR 674 (2001) *and Garret v. Dept. of Defense,* 62 MSPR 666 (1994).

We find that grievant has met her burden of proving by preponderant evidence that she made disclosures that are protected under the WPA.  With respect to both audits, the evidence established that she made informal complaints about certain aspects of the audited programs that she believed evidenced gross mismanagement and a gross waste of funds.  In the South Africa audit, grievant reported that the U.S. government should not have certified the release of $120 million because the HIV/AIDS program was paying much higher prices than other countries for antiretroviral drugs, had poor inventory controls, poor storage facilities, and an inadequate

---

modified this charge by first alleging that she misrepresented her step-daughter, Taja's, age, then attempted to change the charge to pertain solely to improperly requesting an additional safe-haven bedroom for grievant's mother.  The modification issue is not addressed, given the Board's determination of this specification charge.

patient identification system.  Grievant testified that she believed that the criteria for releasing the second half of the funds had not been met, despite the fact that the first $60 million had already been released.  Grievant further testified that her concerns were politically sensitive because then-Secretary Clinton had met with South African President, Jacob Zuma, and had agreed to a one-time award of $120 million to cover the South African government's shortfall in supporting the program.

According to the charged employee, two conditions had not been met:  (1) establishment of a proper system for supply chain management, including, (a) a proper distribution channel for delivery of the antiretroviral medicines to the clinics, (b) regional warehouses to secure the medication, and (c) a system for ensuring that one person could not receive multiple treatment supplies; and (2) establishment of a proper financial system.  Mrs. Iglesias reported that the U.S. Ambassador to South Africa, Donald Gips, was the individual who had certified that the supply chain management system condition had been met, when, in her opinion, it had not.  In addition, she testified that the cost of the medicine was controlled by two families in South Africa who set the prices much higher than what other nations were paying for the same drugs.

Grievant raised her concerns with a number of people, including:  her audit manager, Robert Mason, the RIG, Christine Byrne, some of the implementing partners on the PEPFAR HIV project, and with Reyna Font, the secretary to the DCM.  Despite USAID/OIG's contention that there is no written evidence in the so-called TeamMate file that Mrs. Iglesias made any formal written comments that would constitute disclosures, there is, nonetheless, convincing evidence that she did raise her concerns orally with several individuals.  Mr. Mason was apparently concerned enough with the issues that grievant raised that he consulted the lawyer responsible for the program and documented that conversation in the TeamMate record.

Ultimately, Ms. Byrne concluded that the issues were unrelated to the operation of the treatment program and declined to include grievant's concerns in the final audit document.[34]

In the Madagascar audit, grievant raised concerns that a contraceptive drug, "Microlut 28," had been imported at a cost to the Family Planning Program, but could not be distributed because of new rules imposed by the new Malagasy government following a coup.  Mrs. Iglesias discovered stockpiles of the contraceptive that were unused and about to expire.  In addition, there was an incoming shipment of additional Microlut 28 that could not be distributed.  Grievant wanted to do several things:  (1) report the waste of these drugs in the amount of approximately $100,000, (2) stop the incoming shipment, and (3) try to sell the stockpile to another government that would allow for their distribution.  Her manager, Robert Mason, and the RIG, Christine Byrne, decided that the cause of the wasted contraceptives was a political decision made by the new government and determined that as a matter of policy, no mention would be made of grievant's concerns in the final audit.  Nonetheless, grievant wrote her concerns in the "other issues" section of her audit exit conference notes.

2.  <u>Was Grievant Subjected to a "Personnel Action?"</u>

We conclude that subsequent to her protected disclosures, grievant was subjected to an investigation and adverse personnel actions.  In *Johnson v. Department of Justice,* 104 M.S.P.R. 624, 2007 MSPB LEXIS 490 (February 6, 2007), the Merit Systems Protection Board stated that although an investigation is not considered an adverse personnel decision, nonetheless the reviewing body should consider the motivation for an investigation that is "so closely related to a personnel action that it could have been pretext for gathering evidence to use to retaliate against an employee for whistleblowing."  104 M.S.P.R. at 632, 2007 MSPB LEXIS 490 at 6, *quoting*

---

[34] Grievant insisted that she included some mention about the $120 million in every draft of the South Africa audit report.  The evidence did not support this contention.

*Russell v. Department of Justice,* 76 M.S.P.R. 317, 323-324, 1997 MSPB LEXIS 1010 at 9

(August 18, 1997).  Within several months of her Madagascar audit complaints in March 2011,

Mrs. Iglesias was investigated for reportedly submitting false education transportation allowance

vouchers.  Then, after she made the South Africa audit complaints in July 2011, Ms. McClennon

traveled to Pretoria and expanded the investigation to include all of grievant's financial

reimbursement submissions.  Grievant was then curtailed from her assignment in Pretoria in

September 2011.  Ultimately, in December of the same year, she was proposed for separation

from the Service by the AIG, Michael Carroll.  This was unquestionably an adverse personnel

action.

In the instant case, the adverse personnel action arose directly from the investigation.

Accordingly, because the investigation was closely and directly related to the decision to

recommend that grievant be separated for cause, we deem it appropriate to examine the nexus, if

any, between the investigation and grievant's protected disclosures, as well as any nexus

between the separation recommendation and the disclosures.  If it appears that the investigation

was tainted, that is, that grievant's protected disclosures were a contributing factor in the

decisions to initiate and/or expand the investigation, then we will consider whether the ultimate

decisions to propose and recommend grievant's separation were equally tainted.

3. <u>Were the Official(s) Who Took Adverse Personnel Actions Against the Charged
   Employee Aware of Her Protected Disclosures?  Did the Protected Disclosures
   Contribute to the Personnel Action(s) Taken Against the Charged Employee?</u>

In order to determine whether the audit disclosures were a contributing factor in the

decisions to investigate or separate Mrs. Iglesias, we consider the evidence, direct and

circumstantial, whether the individuals responsible for these decisions had actual or constructive

knowledge of the disclosures.  In the instant case, it is undisputed that the ultimate deciding

official, Mr. Carroll, the AIG, had no actual knowledge of the charged employee's audit

concerns.  It is for this reason that Mrs. Iglesias' counsel initially withdrew the WBR defense.

However, the case law requires a more nuanced analysis than just deciding whether the official

who made the ultimate personnel decision had knowledge of her protected disclosures.

    In the case of *Russell v. DOJ, supra,* the Merit Systems Protection Board concluded that

"[a] whistleblower *need not* demonstrate the existence of a retaliatory motive on the part of the

employee taking the alleged prohibited action in order to establish that his disclosure was a

contributing factor to the personnel action."  1997 MSPB LEXIS 1010 at 7-8. (Emphasis in

original.)  If an individual with knowledge of the protected disclosures influenced the decision

maker, then the knowledge of the influencing individual can be imputed to the decision maker as

constructive knowledge.  *Id.* at 8.

    We find that Mr. Carroll was not personally aware of Mrs. Iglesias' protected audit

disclosures at any critical time, that is:  when he was advised by Ms. McClennon of the

investigation results (between September 15 - 18, 2011), when he proposed grievant's separation

(December 20, 2011), or when he recommended the separation (August 3, 2012).  Mr. Carroll

expressly denied in his 2014 deposition that he had any knowledge of Mrs. Iglesias' audit work

or concerns during the time of her investigation.  (*See* Carroll deposition, June 4, 2014 at pp. 80-

81).  The agency also stated in response to one of grievant's interrogatories that Mr. Carroll's

decisions were made only in consultation with Human Resources personnel, including Nikki

Scott-McCauley of the Office of Management, the Acting Deputy Inspector General, Timothy

Cox, and Legal Counsel, Lisa Goldfluss.[35]  There was no evidence presented that any of those

---

[35] See Agency Response to Charged Employee Interrogatory Number 2, appended to the Charged Employee's
Request for Additional Discovery filed on June 30, 2015, as Exhibit 6 at p.2.

persons had knowledge of the charged employee's audit concerns during her investigation or when she was proposed and recommended for separation.

By the time of the separation recommendation in August 2012, the whistleblower complaint had been filed with the Office of Special Counsel (OSC) on June 5, 2012, however, grievant did not offer any proof that Mr. Carroll or his consultants learned of the whistleblower complaint during the time it was investigated by OSC or prior to the decision to separate grievant for cause.  Thus, we find that there was no evidence that the decision maker who made the separation recommendation (Carroll) had actual knowledge of Mrs. Iglesias' protected audit disclosures, or that the disclosures contributed directly to his decisions.

We next consider whether any of the individuals involved in the investigation were aware of grievant's protected disclosures.  As for the initial investigation by SA Cherer, we found no evidence that he had any information about Mrs. Iglesias' audit disclosures.  He specifically denied any such knowledge and grievant offered no proof otherwise.  (Tr. February 22, 2016 at pp. 179-180).  We acknowledge that the OIG exercised its right to withhold the name of the initial informant who advised Mr. Cherer about grievant's allegedly false education transportation allowance vouchers.  However, we have no reason to infer or conclude that this person was Mr. Cherer.  Accordingly, we find that grievant did not establish preponderant evidence that the initial investigation into her education transportation vouchers was tainted by any knowledge on the part of SA Cherer of her protected disclosures.[36]

With respect to RIG Byrne, the evidence establishes that she was aware of the protected audit disclosures, but there was no proof offered that she influenced or participated in the

---

[36]  The Board declines to draw a negative inference from the agency's failure to disclose the identity of the informant.  We find that the OIG had a sound legal and policy basis for declining to disclose the identity of this individual, under the IGA,  In addition, in a response to a query from the Board, the agency advised that the informant was asked and declined to have his/her identity revealed.

decision to investigate her auditor.  RIG Byrne testified that Ms. McClennon came to South Africa to conduct the investigation, which contradicted Ms. McClennon's testimony that she came to Pretoria for a routine site visit of her posts of responsibility.  This inconsistency could support a suspicion that Ms. Byrne and Ms. McClennon might have communicated about grievant before Ms. McClennon arrived in South Africa, and it could mean that they agreed that Ms. McClennon should take over the investigation from Mr. Cherer.  But this is no more than rank speculation.  There is simply no basis on which to conclude that Ms. Byrne in fact participated in Ms. McClennon's decision to come to Pretoria, or her decision to conduct or expand the investigation into Mrs. Iglesias' financial submissions.[37]

As for the expansion of the investigation by Ms. McClennon, as stated above, it is sheer speculation to guess that Ms. McClennon learned of grievant's disclosures from Ms. Byrne, either by telephone before her trip to South Africa, or at the meeting the two had early during Ms. McClennon's visit to Pretoria.  The possibility that Ms. Byrne advised Ms. McClennon about grievant's audit work in order to influence an investigation into her financial submissions never rose above a suspicion to become proof.

Ms. Lewellen testified that Ms. McClennon came to South Africa "on a mission," and asked for every single voucher or form Mrs. Iglesias had filed since her arrival in Pretoria.  Again, this suggests that Ms. McClennon may have been on a "fishing expedition" aimed at finding something with which to incriminate Mrs. Iglesias.  However, if she was on such an expedition, there is no evidence as to what or who prompted or contributed to the "mission."

---

[37] The Agency made much of Ms. Byrne's statements that she "liked" Mrs. Iglesias, and thought she was "a good auditor."  But, there was also testimony from Ms. McClennon that Ms. Byrne did not trust Mrs. Iglesias, because every action she took and every allowance she sought was considered unusual, requiring either an exception or additional research.  We note that grievant bears the burden of establishing a connection between her supervisor's distrust of her allowance submissions and her protected disclosures.  We found no such direct or circumstantial proof.

Nor, more importantly, is there any proof that anyone with knowledge of grievant's protected audit disclosures influenced the expedition.

We were also puzzled by the contradiction between Ms. McClennon's hearing testimony that the initial investigation "was not progressing," while Mr. Cherer testified that he had basically established the validity of the initial complaint against grievant, even though he had not interviewed all of the relevant witnesses.  By the time Ms. McClennon arrived in Pretoria, SA Cherer had reviewed grievant's educational transportation vouchers and had Mr. Iglesias followed, discovering that Mr. Iglesias was driving the children at least one way to school while claiming that his driver was transporting the children both ways.  Thus, by the time Ms. McClennon arrived at post, SA Cherer had evidence to establish that the initial complaint was legitimate.  In addition, Mr. Cherer testified that internal investigations were generally set to be completed in 120 days, while just over 60 days had passed from the start of the investigation until Ms. McClennon took over the case.  (Tr. February 22, 2016 at pp. 169-170).  SA Cherer claimed not to know why she did so, especially since he thought he had another 60 days in which to complete it.

We find the actions of Ms. McClennon – taking over the investigation, completing a dozen interviews within a few days, apparently doing no other "site visit" work, following the Iglesiases to Italy, refusing their stated offers to provide paperwork on issues she raised – and the actions of Ms. Byrne – moving to approve the curtailment of Mrs. Iglesias, even before the latter returned to post from R&R, "reassuring" AIG Carroll that the Ambassador in Pretoria was pleased with both Ms. McClennon's investigation and the curtailment decision, and her statement that no further "feather-smoothing" would be needed – to be unusual enough to suggest some negative animus against Mrs. Iglesias.  We are constrained, however, to conclude

that the charged employee has not met her burden of proving that the negative animus had

anything to do with her audit conclusions.  We conclude that grievant failed to prove that her

protected disclosures had any connection to the unusually zealous investigation into her financial

and allowance submissions.

Grievant ultimately accused Ambassador Gips of arranging the investigation into her

vouchers and other submissions in retaliation for her protected disclosures about the audit in

South Africa that she claims embarrassed him.  We again find no evidence that grievant's audit

concerns became known by the Ambassador.  The most grievant could establish was that she

discussed her audit concerns with a friend, the DCM's Secretary, Reyna Font.  Grievant testified

that she wanted Ms. Font to communicate her concerns to the Ambassador, but offered no

evidence that this occurred.  Instead, grievant testified that Ms. Font told her that she repeated

grievant's audit concerns to the Ambassador's secretary, but the Ambassador testified credibly

that he knew nothing of Mrs. Iglesias' audit disclosures.  Grievant asks the Board to not credit

the Ambassador's testimony and assume that her audit concerns came to his attention either from

Ms. Font, through his secretary, or during the course of his meetings with PEPFAR and USAID

personnel.  We conclude, however, that grievant did not prove that her disclosures reached the

U.S. Ambassador to South Africa or that the Ambassador participated in any way in the

investigation into her financial submissions.[38]

In sum, we find that USAID/OIG has established preponderant evidence proving four of

five specifications on the charge that grievant knowingly and intentionally submitted false

---

[38] We conclude that much of this evidence and other unusual events surrounding the investigation arguably support the charged employee's claim of a "mosaic" of suspicious events.  Notwithstanding this mosaic of possibly negative feelings toward Mrs. Iglesias, we find no evidence at all of a nexus between the mosaic and her having raised concerns about either of the two audits.

educational transportation vouchers and COLA forms with the intent to deceive her employer

and receive benefits to which she was not entitled.  With regard to the specification concerning

her request for larger housing, we find that USAID/OIG offered insufficient evidence to prove

the specification.  We conclude, therefore, that the charges, with the exception of the housing

request, are sustained.

We further find that the charged employee failed to prove by preponderant evidence that

her protected audit disclosures contributed in any way to the investigation into her financial

submissions or the decision to propose and recommend her separation.  We further find that

grievant did not establish preponderant evidence that anyone involved in the investigation or the

ultimate personnel decision was aware of her protected disclosures or was influenced by

someone with such knowledge.  Accordingly, we do not require the agency to prove that it would

have investigated and recommended Mrs. Iglesias for separation in the absence of her audit

disclosures.

### E.  Penalty

The Board has considered the penalty imposed, which we deem the harshest available.

We recognize that the penalty determination is one that is best left for determination by the

agency and review only to decide whether the penalty is outside the bounds of what is

reasonable.  *See* FSGB Case No. 2003-004 (June 17, 2005) at p. 27 ("The Board will not rubber

stamp a penalty for its responsibility is to ensure that action taken by the agency was within a

zone of reasonableness in relation to the charges upheld.").

In order to establish that a penalty is reasonable, the agency must consider relevant

factors, commonly known as the *Douglas* factors,[39] and similar factors that have been

---

[39] *Douglas v. Veterans Administration*, 5 MSPR 280 (1981).

incorporated, with some modification, into 3 FAM 4375.  Both 3 FAM 4324.3(a)[40] and 4374(1)[41]

require the Department to consider the consistency of the penalty with what has been imposed on

other employees in other cases involving similar offenses.

Mr. Carroll testified that he considered the *Douglas* factors, including the seriousness of

the offenses and the fact that the offenses were intentional and not inadvertent or technical,[42]as

well as the issue of "like penalties for similar offenses."  In the recommendation letter, Mr.

Carroll also stated that he considered the nature of the offenses charged and their relationship to

grievant's duties as a Foreign Service auditor.  He concluded after reviewing the evidence that

Mrs. Iglesias' retention as an employee would not promote the efficiency or integrity of the

Service.

Mrs. Iglesias argued that the record is devoid of any evidence that the penalty is

appropriate or that there is a relationship between the charges and the efficiency of the Service.

Also, she argued that there is no evidence that the penalty recommended is like any other

imposed for similar offenses.  She notes Mr. Carroll's testimony that no other OIG employee has

ever been disciplined for this type of conduct and that, in his view, each disciplinary matter

should be decided independent of other similar cases, in direct violation of the precept of "like

penalties for similar offenses."  *See* Grievant's Post-Hearing Brief at pp. 58-59.

We are satisfied that Mr. Carroll understood his obligation to review and consider the

*Douglas* factors.  He noted the nature and seriousness of the offense, and its relation to grievant's

duties as an auditor, including her responsibilities to ferret out false representations, at a time

---

[40] "Before proposing disciplinary action, the proposing official will review prior similar cases within the Agency, in order to foster equity and consistency in the imposition of discipline …."
[41] "The disciplinary action taken should be consistent with the precept of like penalties for similar offenses with mitigating or aggravating circumstances taken into consideration …."
[42] Mr. Carroll testified at the hearing that he did not know what grievant's intent was, but stated:  "I think that based on what I do know from the evidence that was an intentional act."  (Tr. July 31, 2014 at p. 10).

when she was making false representations in some of her personal financial submissions.  He further considered that the evidence proved that grievant's offenses were not accidental, but were intentional, repeated, and resulted in financial gain to her at the agency's expense.  It is also clear that Mr. Carroll considered evidence of grievant's senior fiduciary and supervisory role in the agency.  Mr. Carroll stated that he curtailed grievant even before she returned to post because he was concerned about the effect of the investigation findings on her continued ability to perform her work at a satisfactory level.  He conceded that he did not identify any cases similar to the instant one in order to consider a consistent penalty.  At the same time, the charged employee does not offer any cases that she claims are similar to this one, with different penalties.  The record does not reveal that there was any notoriety of the offense, other than that one confidential informant learned of the false educational transportation vouchers.

As for mitigating circumstances, the record does not reveal that grievant offered any for Mr. Carroll to consider other than, perhaps, the length of her career with the agency.  We did note that throughout these proceedings, particularly during her testimony, grievant expressed no remorse for her actions.  She excused her conduct as being the fault of others, including blaming her husband for giving her inaccurate information, and her employer for not catching the "mistakes" she claimed she made on her financial submissions.  Grievant presented throughout the proceedings as seemingly unaware and without regret that her various submissions were consistently erroneous, resulting in relatively minor, but repeated financial gain to herself and her family.

Even though the Board did not uphold the charge regarding Mrs. Iglesias' housing, we find that the repeated nature of her false travel and COLA reimbursement voucher submissions are significant and concerning.  Mrs. Iglesias was an auditor, trained to ferret out fraud and

misrepresentation, which reasonably outweighed the relatively small financial gain that accrued to her.  We also note that few, if any, of the voucher errors resulted in accidental gain in the agency's favor

The Board notes that in instances of falsification, the MSPB has repeatedly held that the ultimate penalty of removal may be appropriate in intentional falsification cases because falsification is grave misconduct that negatively reflects on an employee's reliability, veracity, trustworthiness and ethics.  *See*, *e.g., Phillips v. Department of the Interior,* 95 M.S.P.R. 21, 2003 MSPB LEXIS 781 (September 26, 2003), *aff'd*, 131 F. App'x. 709 (Fed. Cir. 2005).

Given the circumstances of this case – numerous false vouchers submitted by a trained auditor which repeatedly accrued to her benefit –we conclude that the deciding official appropriately considered the evidence of misconduct by one of his employees, reviewed whether there had been a penalty imposed for similar behavior, and carefully considered both aggravating and mitigating factors before proposing the separation.

**V.      CONCLUSION**

We conclude that USAID/OIG has established sufficient cause for grievant's separation.

**For the Foreign Service Grievance Board**

_____
Susan R. Winfield
Presiding Member

_____
Nancy M. Serpa
Member